IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHARRON MICHELLE BURKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1288-CFC-SRF |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

## I.      INTRODUCTION

Plaintiff Sharron Michelle Burke ("Burke") filed this action on July 10, 2019 against the defendant Andrew Saul, the Commissioner of the Social Security Administration (the "Commissioner").  Burke seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's September 25, 2018 final decision, denying Burke's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434 and §§ 1381–1383f.  The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).  Currently before the court are cross-motions for summary judgment filed by Burke and the Commissioner.[1]  (D.I. 16; D.I. 18)  Burke asks the court for an immediate award of benefits.  (D.I. 16 at 5)  The Commissioner requests the court affirm the ALJ's decision.  (D.I. 18 at 2)  For the reasons set forth below, the court

---

[1] The briefing for the present motions is as follows:  Burke's motion and opening brief (D.I. 16), the Commissioner's combined opening brief in support of his motion for summary judgment and answering brief in opposition to Burke's motion (D.I. 19), and Burke's reply brief (D.I. 21).

recommends DENYING Burke's motion for summary judgment (D.I. 16) and GRANTING the Commissioner's cross-motion for summary judgment (D.I. 18).

## II.   BACKGROUND

### A.  Procedural History

Burke filed a DIB application on February 8, 2016,[2] and an application for SSI on March 16, 2016. [3]  (D.I. 13-2 at 34; D.I. 13-5 at 2, 6)  In her DIB application, Burke claimed a disability onset date of June 15, 2014.  (D.I. 13-5 at 2)  In her SSI application, Burke claimed a disability onset date of June 1, 2014.  (D.I. 13-5 at 6)  Her claims were initially denied on August 18, 2016, and denied again after reconsideration on October 20, 2016.  (D.I. 13-2 at 34)  Burke then filed a request for a hearing, which occurred on August 23, 2018.  (*Id.*)  On September 25, 2018, Administrative Law Judge Steven Butler (the "ALJ") issued an unfavorable decision, finding that Burke was not disabled under the Act because she retained the residual functional capacity ("RFC") to perform work that existed in significant numbers in the national economy.  (*Id.* at 44)  The Appeals Council subsequently denied Burke's request for review on May 3, 2019, rendering the ALJ's decision the final decision of the Commissioner.  (*Id.* at 2; D.I. 16-3 at 10)  On July 10, 2019, Burke brought a civil action in this court challenging the ALJ's decision.  (D.I. 2)  On February 27, 2020, Burke filed a motion for summary judgment, and on April 27, 2020, the Commissioner filed a cross-motion for summary judgment.  (D.I. 16; D.I. 18)

### B.  Medical History

At the time of the ALJ's decision, Burke was forty-five years old.  (D.I. 13-2 at 43–44)

---

[2] The ALJ noted that Burke filed this application on February 5, 2016, but the application is dated March 16, 2016.  (D.I. 13-2 at 34; D.I. 13-5 at 2)
[3] The ALJ noted that Burke filed this application on February 18, 2016, but the application is dated March 16, 2016.  (D.I. 13-2 at 34; D.I. 13-5 at 6)

Burke completed a college degree and previously worked as a home health aide,[4] a van driver,

and a counselor.  (*Id.* at 56–62)  The ALJ found that Burke has the following severe

impairments: lumbar degenerative disc disease with radiculopathy and cervical degenerative disc

disease.[5]  (*Id.* at 37)  Burke was forty-one years old on her alleged disability onset dates.  (*Id.* at

43)

### 1. Physical Impairments

Burke originally injured her lower back at work on March 20, 2014 after lifting a client.

(D.I. 13-12 at 20)  From November 24, 2014 to October 12, 2015, Burke attended fourteen

medical appointments at Westside Family Health.  (D.I. 13-9 at 5)  On November 24, 2014, Dr.

Elizabeth Daly, M.D. ("Dr. Daly"), treated Burke for back and left leg pain.  (*Id.* at 32)  Dr. Daly

reported that the left leg pain was reproducible with a straight-leg test, with no showing of spinal

or paraspinal tenderness.  (*Id.* at 33)  Dr. Daly also noted that Burke had normal strength in her

bilateral lower extremities, normal range of motion with forward flexion and back extension, and

normal patellar reflexes.  (*Id.*)  Burke was treated with NSAIDs, physical therapy, and a heating

pad.  (*Id.*)  A January 2, 2015 lumbar spine x-ray showed mild sclerotic osteoarthritic

degenerative changes of the L4-L5 and L5-S1 facet joints, without spondylolisthesis.  (*Id.* at 82)

On March 30, 2015, Taylor Burge, FNP-BC ("Ms. Burge"), evaluated Burke for pain

radiating from her lower back to her hip and leg.  (D.I. 13-9 at 20)  Ms. Burge diagnosed Burke

with lumbar radiculopathy.  (*Id.* at 22)  During Burke's May 15, 2015 evaluation, Ms. Burge

reported that Burke's MRI presented a slight bulge of the discs at L4-L5 and L5-S1.  (*Id.* at 16)

---

[4] Burke asserts that she was a direct support specialist and disputes the ALJ's use of the title "home health aide."  (D.I. 16 at 2)
[5] Burke also has the following non-severe impairments as determined by the ALJ: left elbow injury, hip injury, right knee injury, and obesity.  (D.I. 13-2 at 37)

Ms. Burge further stated there was no evidence of marked narrowing of the thecal sac at any level in the lumbar region.  (*Id.*)   Burke was provided with a back brace for her impairment.  (*Id.* at 9)

From November 28, 2014 to March 6, 2015, Burke attended physical therapy at Dynamic Physical Therapy for pain on the left side of her lower back, lateral hip, buttock, and anterior thigh.  (D.I. 13-8 at 2, 89–90)  On March 6, 2015, Dr. Caitlin Trout, DPT ("Dr. Trout"), found that Burke sits leaning to the right to decrease pressure on the left buttock, that her sit-to-stand transfers were mildly antalgic, and that she ambulates with a symmetrical gait pattern with a mildly flexed left side.  (*Id.* at 88)  Dr. Trout reported that Burke's joint mobility improved to allow for increased range of motion ("ROM") that facilitates improved functional mobility.  (*Id.* at 89)  Dr. Trout noted that Burke was able to perform exercises without complaints of pain and was progressing toward her long-term goals.  (*Id.*)

On June 24, 2016, Dr. Charles G. Case, M.D. ("Dr. Chase"), treated Burke at Henrietta Johnson Medical Center for bilateral lumbar radiculopathy, and he noted Burke had a normal gait, normal posture, and normal coordination.  (D.I. 13-9 at 57–58)  During Burke's July 22, 2016 follow up, Dr. Case prescribed Gabapentin to Burke for her pain, which she described as lower back pain and stiffness radiating through her legs.  (*Id.* at 55)  Burke rated her pain as a seven out of ten.  (*Id.*)

On November 18, 2016, Dr. Yvette Gbemudu, M.D. ("Dr. Gbemudu"), diagnosed Burke with lumbar disc disease and stenosis.  (D.I. 13-9 at 63)  According to Dr. Gbemudu, an MRI of Burke's lower back presented L4-L5 degenerative changes, causing mild to moderate foraminal stenosis and possible L4 nerve root compression, as well as moderate left and mild to moderate right L5-S1 foraminal stenosis.  (*Id.* at 66)  Dr. Gbemudu reported that Burke's symptoms will

often interfere with the attention and concentration required for Burke to perform work-related tasks.  (*Id.* at 63)  According to Dr. Gbemudu, Burke could sit for four hours, stand for two hours, and would need an unscheduled break every one or two hours for ten minutes during an eight-hour workday.  (*Id.*)  Dr. Gbemudu also indicated that Burke could walk two city blocks, could frequently lift less than ten pounds, could occasionally lift twenty pounds, and would be absent from work three or four days per month as a result of her impairments.  (*Id.* at 63–64)

From May 26, 2017 to December 29, 2017, Burke attended physical therapy for her chronic lower back pain.  (D.I. 13-10 at 36–37)  According to Ganesh Balu, M.D., Burke's initial onset of pain that caused her to seek this round of physical therapy occurred without any precipitating event or trauma.  (*Id.* at 37)  During the December 29, 2017 appointment, Burke reported improvement for her lower back pain, which she described as aching, burning, dull, sharp, and shooting.  (*Id.*)  Burke further reported that her pain frequency was daily, pain duration was constant, and pain severity was two out of ten.  (*Id.*)

On February 6, 2018, Dr. James Sheehan, D.C. ("Dr. Sheehan"), found that Burke sustained injuries to her spine due to her January 12, 2018 fall down steps at work; however, Dr. Sheehan also ruled out the possibility of herniated discs and nerve damage.  (D.I. 13-12 at 9)  During this evaluation, Dr. Sheehan reported that Burke would be totally unable to work.  (*Id.*)  A March 23, 2018 EMG and nerve conduction study reported abnormal results, with lumbar radiculopathy affecting the L4-L5 and L5-S1 left root levels and left tibial (motor) neuropathy.  (*Id.* at 4)  Again, on April 12, 2018, Dr. Sheehan reported Burke would be unable to work, and he diagnosed Burke with an intervertebral disc disorder with myelopathy in the lumbar region.  (*Id.* at 3)  Dr. Sheehan did not indicate Burke's functional abilities or limitations during his evaluation.  (*Id.*)  On May 1, 2018, Dr. Sheehan reported that Burke's injuries were stabilizing.

(D.I. 13-11 at 7–9)  Also on May 1, 2018, Burke stated the pains in her neck, back, right knee, and left elbow, which were injuries resulting from her January 2018 fall, were mild in severity, improved in status, and three out of ten in intensity.  (*Id.* at 7)

On August 18, 2016, Dr. Darrin Campo, M.D. ("Dr. Campo"), a State Agency medical consultant, opined that Burke could occasionally lift or carry fifty pounds and could also frequently lift or carry twenty-five pounds.  (D.I. 13-3 at 16–18)  Dr. Campo further suggested that Burke could stand for six hours and sit for six hours during an eight-hour workday.  (*Id.* at 16)  According to Dr. Campo, Burke could be exposed to extreme heat and extreme cold, wetness, and humidity but should avoid concentrated exposure to vibration and machinery.  (*Id.* at 17)  On October 20, 2016, Dr. Michael Borek, D.O. ("Dr. Borek"), a State Agency medical consultant, opined that Burke could occasionally lift or carry twenty pounds and could frequently lift or carry ten pounds.  (*Id.* at 28)  Like Dr. Campo, Dr. Borek suggested that Buke could stand for six hours and sit for six hours during an eight-hour workday.  (*Id.* at 28–30)  According to Dr. Borek, Burke could occasionally climb ramps or stairs, never climb ladders or ropes, and occasionally balance, stoop, kneel crouch or crawl.  (*Id.* at 29)  Dr. Borek noted that Burke was obese with a body mass index ("BMI") of 34.7 on the day of her evaluation.  (*Id.* at 22)

### C.  Hearing Before ALJ Butler

#### 1.  Burke's Testimony

Burke testified that she lives with her friend.  (D.I. 13-2 at 55)  She has a driver's license and drives herself to work and to run errands.  (*Id.* at 56)  Burke stated that she has a bachelor's degree in psychology.  (*Id.*)  Burke last worked as a van driver for Tatnall School ("Tatnall") from the end of 2017 to June 2018.  (*Id.* at 58)  Before working for Tatnall, Burke worked as a counselor for Child, Inc. from late 2015 to early 2017 and as a home health aide for Chimes

Metro from 2003 to 2014.  (*Id.* at 56–57, 60)

Burke testified that she is unable to work because she injured her back lifting a patient when she worked as a home health aide.  (D.I. 13-2 at 62)  She also testified that she experiences pain in her lower and upper back, neck, legs, and shoulders.  (*Id.* at 62–64)  Burke reported that her neck injury worsened after she fell down six or seven steps at work on January 12, 2018.  (*Id.* at 67; D.I. 13-11 at 71)  Burke received physical therapy, medication, and injections for her injuries.  (D.I. 13-2 at 62)  She noted that the injections temporarily relieve her upper back and neck pain, but the injections do not relieve her lower back pain.  (*Id.*)  Burke testified that she takes Topiramate for headaches and Flexeril for muscle spasms.  (*Id.* at 64–65, 68–69)  Both medications make her drowsy.  (*Id.* at 69)  Burke reported that she can sit with the assistance of a lumbar seat for about two hours before she must lay down for relief, that she can stand for ten minutes before she must lean on a structure for support, and that she can walk two blocks.  (*Id.* at 66–67)  Burke stated that she does not lift more than ten pounds.  (*Id.* at 67)

Burke explained that she can grocery shop with a friend's assistance.  (*Id.*)  Burke can also wash dishes, cook, and clean the inside of her house.[6]  (*Id.* at 63, 67–68)  Burke testified that she cleans the inside of her house in sections because she needs to take breaks.  (*Id.* at 67–68)  Burke reported that her back pain forces her to lean on the sink when she washes dishes.  (*Id.* at 63)  Burke further explained that her neck pain shoots up the back of her head and gives her headaches that can last two days.  (*Id.* at 64–65)  Burke testified that her hip has shifted, which makes it difficult for her to sit.  (*Id.* at 65)  Burke reported that changes in temperature and

---

[6] In addition to her testimony, in a Function Report to the Social Security Administration ("SSA"), Burke stated that she washes dishes daily, separates laundry twice a month, and vacuums once a week.  (D.I. 13-6 at 25)  Burke further stated that she does not do yard work. (*Id.*)

humidity negatively affect her back.  (*Id.* at 70)  Burke testified that she spends most of her day

sitting in a recliner chair or laying down in an attempt to heal her injuries.  (*Id.* at 67)

## 2.   Vocational Expert Testimony Before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

> I'd like you to consider a hypothetical individual of the claimant's age, education
> and the past relevant work as the home health aide; assume that this individual is
> limited to a range of sedentary work, but would be unable to climb ropes, ladders
> or scaffolds; would be unable to be exposed to hazards like unprotected heights or
> moving machinery; this individual could occasionally climb ramps or stairs,
> balance, stoop, kneel, crouch and crawl; this individual could occasionally reach
> overhead with the bilateral upper extremities and frequently reach in all other
> directions with the upper extremities; this individual would need the ability to sit
> for up to an hour after standing or walking for 15 minutes; would need the ability
> to stand up for 10 minutes after sitting for periods of up to two hours; but could
> alternate between the two positions and stay productive in either position
> throughout the workday; the individual could have no concentrated exposure to
> extreme cold, heat, humidity, wetness or vibration; and could occasionally push or
> pull with all extremities, could this individual perform any of the claimant's past
> relevant work as a home health aide?

(D.I. 13-2 at 72–73)  The VE testified that this hypothetical individual would not be able to

perform claimant's past work as a home health aide.  (*Id.* at 73)  However, the VE testified that

the hypothetical individual described could perform the duties of a call-out operator, document

preparer, and table worker.  (*Id.*)  The VE explained that her testimony was consistent with the

Dictionary of Occupational Titles ("DOT"), but the DOT does not address sit/stand options or

directional reaching.  (*Id.* at 74)  The VE noted that her testimony to these issues was based on

twenty-five years of experience in job placement and observations of job performance.  (*Id.*)

The ALJ inquired about the customary breaks that are provided for the three types of jobs

suggested by the VE.  (*Id.*)  The VE responded, based on her experience alone, that these jobs

generally have a fifteen-minute break after two hours of work, either a half hour or an hour for

lunch, and a second fifteen-minute break in the afternoon after two hours of work.  (*Id.*)

Burke's attorney asked the VE whether there would be available work for the hypothetical individual if (1) that person would be absent from work three to four times a month, or (2) the individual needed to lie down while at work.  (*Id.* at 75)  The VE stated that there would be no work for an individual who would need three to four absences a month and that employers would not tolerate lying down at work.  (*Id.*)

### D.  The ALJ's Findings

Based on the factual evidence in the record and the testimony by Burke and the VE, the ALJ determined that Burke was not disabled under the Act for the relevant time period from June 15, 2014 through September 25, 2018, the date of the ALJ's decision.  (D.I. 13-2 at 35)  The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 30, 2021.

2. The claimant has not engaged in substantial gainful activity since June 15, 2014, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq.*).

3. The claimant has the following severe impairments:  lumbar degenerative disc disease with radiculopathy; and cervical degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she cannot climb ropes, ladders, or scaffolds, and cannot be exposed to hazards like unprotected heights or moving machinery.  The claimant can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl.  She can occasionally reach overhead with the bilateral upper extremities and frequently reach in all other directions with the upper extremities.  She needs the ability to sit for up to an hour after standing or walking for up to 15 minutes.  She needs the ability to stand for up to 10 minutes after sitting for periods of up to 2 hours.  She can alternate between the two positions and stay productive in either position throughout the workday.  She can have no concentrated exposure to extreme

cold, extreme heat, humidity, wetness, or vibration.  She can occasionally push or pull with all extremities.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 28, 1973 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*Id.* at 36–44)

## III.    STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'"  *Pearson v. Comm'r of Soc. Sec.*, 2020 WL 7054447, at *2 (3d Cir. Dec. 2, 2020) (quoting *Biestek*, 139 S.Ct. at 1154).  When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."

*Biestek*, 139 S. Ct. at 1154 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more than a mere scintilla" of evidence. *Id.*

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Act affords insurance benefits to people who contributed to the program and who have a disability. *See Pearson*, 2020 WL 7054447, at *2 (citing 42 U.S.C. § 423(a)(1)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to

determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id*. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id*. §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See id*. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether

he or she is capable of performing work and is not disabled.  *See id.*  The ALJ often seeks the

VE's assistance in making this finding.  *See id.*

### B.  Whether the ALJ's Decision is Supported by Substantial Evidence

On September 25, 2018, the ALJ found Burke was not disabled within the meaning of the

Act from June 15, 2014 through the date of the decision.  (D.I. 13-2 at 44)  The ALJ concluded

that, despite Burke's severe impairments (lumbar degenerative disc disease with radiculopathy

and cervical degenerative disc disease), Burke had the RFC to perform sedentary work[7] and

perform jobs that exist in significant numbers in the national economy.  (*Id.* at 39–43)  The ALJ

found that Burke cannot climb ropes, ladders, or scaffolds; cannot be exposed to hazards like

unprotected heights or moving machinery; can occasionally climb ramps or stairs, balance,

stoop, kneel, crouch, or crawl; can occasionally reach overhead with bilateral upper extremities

and frequently reach in all other directions with upper extremities; and can occasionally push or

pull with all extremities.  (*Id.* at 39)  The ALJ further found that Burke needs the ability to sit for

up to an hour after standing or walking for up to fifteen minutes; needs the ability to stand for up

to ten minutes after sitting for periods of up to two hours; can alternate between the two positions

and stay productive in either position throughout the workday; and can have no concentrated

exposure to extreme cold, extreme heat, humidity, wetness, or vibration.  (*Id.*)  After considering

the VE's testimony, the ALJ found that Burke could not return to her past relevant work as a

home health aide.  (*Id.* at 43)  However, the VE testified that Burke could work as a call-out

---

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or
carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as
one which involves sitting, a certain amount of walking and standing is often necessary in
carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and
other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

operator, a document preparer, or a table worker.[8]  (*Id.* at 44)

Burke asserts three main arguments on appeal[9]: (1) the ALJ erred in assessing Burke's subjective pain in light of the medical evidence in the record; (2) the ALJ erred as a matter of law in failing to give adequate weight to Burke's medical evidence; and (3) the ALJ misattributed Burke's symptoms to obesity when determining her RFC.  (D.I. 16 at 2–4)

### 1. Burke's Symptoms

Burke argues that the ALJ erred in his assessment of her subjective pain in determining the intensity, persistence, and limiting effects of her symptoms.[10]  (D.I. 16 at 2–4)  If a plaintiff

---

[8] The VE testified that, nationally, there are an estimated 7,900 jobs as a call-out operator, 44,600 jobs as a document preparer, and 98,000 jobs as a table worker.  (D.I. 13-2 at 44)

[9] Additionally, Burke asserts that the Commissioner answered Burke's complaint late and did not notify Burke.  (D.I. 16 at 4)  The Commissioner filed a motion for extension of time to file an answer on November 14, 2019, which the court granted on November 15, 2019.  (D.I. 10)  In that order, the court set a December 14, 2019 deadline for the Commissioner to file his answer. On December 19, 2019, the Commissioner filed a motion for leave to file the answer nunc pro tunc (to file the answer on December 19, 2019, instead of the original extension filing date of December 14, 2019), which the court granted.  (D.I. 11)  On the same date, December 19, 2019, the Commissioner filed his answer.  (D.I. 12)  A copy of the motion for extension of time to file an answer was sent to Burke via first class mail on November 14, 2019.  (D.I. 10 at 3). A copy of the motion to file an answer nunc pro tunc was sent to Burke via first class mail on December 19, 2019.  (D.I. 11 at 4)  And a copy of the answer was sent to Burke via first class mail on December 19, 2019.  (D.I. 12 at 4)  Therefore, the Commissioner timely filed an answer and properly served Burke via first class mail.

[10] Burke asserts that the ALJ assumed that Burke and her medical experts committed fraud for the sake of disability.  (D.I. 16 at 4)  Pursuant to Social Security Ruling 16-3p ("SSR 16-3p") , an ALJ must evaluate a claimant's symptoms based on all evidence in the record, and not the claimant's character."  *Brando v. Colvin*, 2017 WL 2364194, at *21 n.4 (D.N.J. May 31, 2017). The ALJ's decision does not reflect that the ALJ found Burke or her medical experts to be fraudulent; rather, the decision shows that the ALJ did not did not agree with all of Burke's subjective complaints because of evidence in the record showing that such complaints were not supported by other objective evidence from the record.  *See* SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017) ("[A]n individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.").  Nothing in the record or in the ALJ's decision shows that the ALJ based his decision on Burke's character.  To the extent that the ALJ based his conclusions on a determination of Burke's credibility and the credibility of her other medical evidence, "credibility determinations of an administrative judge are virtually unreviewable on appeal."  *Hoyman v. Colvin*, 606 F. App'x 678, 681 (3d Cir. 2015).

alleges impairment-related symptoms, a two-step process is used to evaluate such symptoms: (1) the ALJ must consider "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms"; and (2) the ALJ must evaluate "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p, 2017 WL 5180304, at *3.

Burke argues that the ALJ failed to adequately consider the evidence supporting her subjective complaints about the intensity, persistence, and limiting effects of her symptoms. (D.I. 16 at 4) However, substantial evidence supports the ALJ's determination of Burke's RFC and his evaluation of her symptoms because the ALJ considered the entire record and concluded, based on more than a "mere scintilla" of evidence, that Burke's symptoms did not exist at the level of severity that she testified to at her hearing. *Biestek*, 139 S. Ct. at 1154. Contrary to Burke's argument, the ALJ considered Burke's subjective complaints. (D.I. 13-2 at 40)

Subjective complaints, alone, do not require an ALJ to find that the claimant is disabled. 20 C.F.R. §§ 404.1529(a), 416.929(a). The ALJ was required to consider "any symptom-related functional limitations and restrictions that [Burke's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(3). The ALJ noted that the entire evidentiary record, including Burke's testimony and her reports to treating medical professionals, did not support Burke's testimony about the intensity, persistence, and limiting effects of her symptoms. (D.I. 13-2 at 39–43) For example, despite Burke's arguments, Burke described her pain symptoms as "greatly improved" and, on average, two out of ten in severity in the record. (D.I. 13-10 at 37) In addition, upon examination on January 4, 2017, Burke had moderate lower lumbar tenderness,

a negative straight leg raise test, normal gait, normal muscle strength of extremities, no weakness or atrophy, normal sensory exam, and depressed deep tendon reflexes.  (D.I. 13-12 at 25)  The ALJ acknowledged that Burke aggravated her condition when she fell at work on January 12, 2018.  (D.I. 13-11 at 71)  However, the ALJ relied on Burke's reported decrease in pain intensity, which she described as mild and improved for her neck, back, and headaches on May 1, 2018.  (*Id.* at 7)   Moreover, the ALJ relied on Burke's Function Report in assessing her limitations, in which she stated that she washes dishes daily, separates laundry twice a month, and vacuums once a week.  (D.I. 13-6 at 25)  This evidence, outlined above, is exactly the type of evidence that the ALJ may consider when he weighs evidence of Burke's subjective pain symptoms and the "intensity, duration, and [the] limiting effects" resulting from those symptoms.  *Hoyman*, 606 F. App'x at 681.

In making an RFC determination, the ALJ considered the entire evidentiary record and accounted for Burke's symptoms, including pain, to the extent those symptoms were supported by objective medical evidence and other evidence in the record.  (D.I. 13-2 at 39–44)  The ALJ imposed environmental and postural limitations on Burke's RFC that were consistent with Burke's reported symptoms and the evidentiary record.  (*Id.*)  Substantial evidence supports the ALJ's decision; he cited more than a "mere scintilla" of evidence in making his determination of Burke's RFC and in his evaluation of Burke's reported intensity, persistence, and the limiting effects of her symptoms.  *See Biestek*, 139 S. Ct. at 1154.

### 2. Medical Opinion Evidence

Burke argues that the ALJ failed to properly weigh the medical opinion evidence in the record.[11]  (D.I. 16 at 2–4)  The ALJ gave little weight to the opinion of Dr. Gbemudu, M.D., Burke's treating physician, and no weight to the opinion of Dr. Sheehan, D.C., Burke's chiropractor.  (D.I. 13-2 at 42)

To determine the proper weight to give a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts.  *See Richardson v. Perales*, 402 U.S. 389, 399 (1971).  Although the findings and opinions of treating physicians are entitled to substantial weight, "'[t]he law is clear … that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity.'"  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)).  Instead, RFC and disability determinations are issues reserved for the Commissioner.  20 C.F.R. § 404.1527(d).[12]  Moreover, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'"  *See Scouten v. Comm'r of Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)).  Where the opinion is not controlling, the ALJ must consider factors such as the length and frequency of treatment

---

[11] To the extent that Burke asserts that the ALJ assumed medical experts were committing fraud for the sake of disability (D.I. 16 at 4), "[the ALJ] must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence."  *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).  Here, the ALJ's decision (D.I. 13-2) does not reflect that the ALJ assumed that Burke's medical experts were committing fraud; rather, the decision shows that the ALJ gave less weight to opinions of Dr. Gbemudu and Dr. Sheehan because those opinions were inconsistent with other substantial evidence in the record.  *See Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (holding that an ALJ "may reject" a physician's opinion "on the basis of contradictory medical evidence and not due to his or her own credibility judgments").
[12] 20 C.F.R. §§ 404.1527 and 416.927 were superseded by 20 C.F.R. §§ 404.1520c and 416.927c for claims filed on or after March 27, 2017. Because Burke's claims were filed prior to this date, 20 C.F.R. §§ 404.1527 and 416.927 remain in effect.  *See* C.F.R. §§ 404.1527, 416.927.

visits, nature and extent of the treatment relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the record as a whole, and the medical source's specialization.  20 C.F.R. §§ 404.1527(c)(2)(i)–(ii).  The court does not re-weigh the medical opinions in the record; rather, the court is tasked to "determine whether substantial evidence exists to support the ALJ's weighing of those opinions."  *Ransom v. Berryhill*, C.A. No. 17-939-LPS, 2018 WL 3617944, at *7 (D. Del. July 30, 2018) (citing *Gonzalez v. Astrure*, 537 F. Supp. 2d 644, 659 (D. Del. 2008)).

"[A]n ALJ need not explicitly discuss each [20 C.F.R. 404.1527(c)] factor in his decision . . . . [Rather], the ALJ is 'simply required to indicate how the evidence was weighed and evaluated, in a clear enough way to permit judicial review.'"  *Samah v. Comm'r of Soc. Sec.*, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018) (quoting *Laverde v. Colvin*, 2015 WL 5559984, at *6 (W.D. Pa. Sept. 21, 2015)).  Here, the ALJ considered the relevant factors in determining how much weight to afford the opinions of Dr. Gbemudu and Dr. Sheehan.  The ALJ reasoned that Dr. Gbemudu's opinion should be afforded "little weight" because her opinion is "overly severe" and not consistent with the treatment records and objective testing.  (D.I. 13-2 at 42) The ALJ noted that Dr. Gbemudu opined that Burke has lumbar disc disease, which would often interfere with the attention and concentration needed to perform work related tasks.  (D.I. 13-9 at 63)  Dr. Gbemudu further opined that, in an eight-hour workday, Burke would be able to sit for four hours, stand for two hours, and need unscheduled breaks every one or two hours for ten minutes; and that Burke would be absent from work three to four days a month.  (*Id.* at 63–64) However, the ALJ noted that Dr. Gbemudu's opinion was inconsistent with the record.  (D.I. 13-2 at 42)  For example, progress notes of treatment records from May, June, and July of 2016

indicate that Burke had a normal gait, normal posture, normal cognitive functioning, and an all-around normal exam other than a reported obese BMI.  (D.I. 13-9 at 55–58, 67–68, 72–79)

Substantial evidence supports the ALJ's determination that Dr. Gbemudu's opinion was entitled to "little weight" because her opinion was "inconsistent with the other substantial evidence in [the] case record."  *Scouten*, 722 F. App'x at 290.  The ALJ afforded Dr. Gbemudu's opinion little weight, rather than no weight, because her medical opinion also opined that Burke can frequently lift less than ten pounds and can occasionally lift twenty pounds, which is consistent with other evidence in the record—Dr. Borek's medical opinion.  (D.I. 13-3 at 28)

"The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion."  20 C.F.R. § 404.1527(c)(3).  "Opinions on some issues . . . are not medical opinions, as described in [20 C.F.R. § 404.1527(a)(1)], but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case."  *Id.* § 404.1527(d).  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that you are disabled."  *Id.* § 404.1527(d)(1).  Here, the ALJ reasoned that Dr. Sheehan's opinion should be afforded "no weight" because the opinion was "conclusory" and "not a medical opinion, per se, but is, instead, an opinion on an issue reserved for the Commissioner."  (D.I. 13-2 at 42)  The ALJ noted that Dr. Sheehan opined that Burke would be unable to work any hours a day due to her fall at work on January 12, 2018.  (D.I. 13-12 at 3, 9)  The ALJ also noted, however, that Dr. Sheehan's opinion did not provide an adequate explanation for the evidence that he relied on to form his opinion.  (D.I. 13-2 at 42)  For example, Dr. Sheehan's opinion did not indicate what Burke's functional abilities and limitations were, nor did his opinion provide a reason for why Burke is unable to work.  (D.I. 13-12 at 3–4,

9)  Substantial evidence supports the ALJ's determination that Dr. Sheehan's opinion is entitled to "no weight" because his opinion does not "present[] relevant evidence to support [his] medical opinion" that would entitle the ALJ to give "more weight . . . to that opinion."  20 C.F.R. § 404.1527(c)(3).  In addition, substantial evidence supports the ALJ's determination with respect to Dr. Sheehan's opinion because it is "inconsistent with the other substantial evidence in [the] case record."  *Scouten*, 722 F. App'x at 290 (quoting 20 C.F.R. § 404.1527(c)(2)).  For example, Dr. Gbemudu, Dr. Borek, and Dr. Campo stated in their respective medical opinions that Burke would be able to work under varying limitations.  (D.I. 13-9 at 63–66; D.I 13-3 at 16–18, 28–30)  Finally, the ALJ noted that Dr. Sheehan's opinion was conclusory because Dr. Sheehan opined that Burke would be unable to work, which is a determination that Burke is disabled.  20 C.F.R. § 404.1527(d)(1).  An opinion that a claimant is "disabled" or "unable to work" is "not a medical opinion[]" but, instead is an opinion on an issue "reserved for the Commissioner."  *Id.* § 404.1527(d).

In summary, the court finds that the ALJ's determinations as to the weight to afford the various medical opinions in the record, including but not limited to those of Dr. Gbemudu and Dr. Sheehan, are supported by substantial evidence.

### 3. Obesity

Burke argues that the ALJ misattributed her symptoms to obesity when he determined Burke's RFC.  (D.I. 16 at 4)  The National Institutes of Health ("NIH") classify an individual as obese if that individual's body mass index ("BMI") equals or exceeds thirty.  SSR 02-1p,[13] 2002

---

[13] SSR 02-1p was rescinded and replaced by SSR 19-2p, effective May 20, 2019.  SSR 19-2p, 2019 WL 2374244, at *1 (May 20, 2019).  Because Burke's claims were filed before the effective date, SSR 02-1p remains in effect.  *See* SSR 19-2p, 2019 WL 2374244, at *1–2, 5 n.14.

WL 34686281, at *2 (Sept. 12, 2002).  "In making [an RFC] finding, the ALJ must consider all

of the claimant's impairments, including those that are not severe."  *Gregory v. Berryhill*, C.A.

No. 17-991-CFC-SRF, 2019 WL 643736, at *9 (D. Del. Feb. 15, 2019), *report and

recommendation adopted*, 2019 WL 1470221 (D. Del. Apr. 3, 2019).  "There is no specific level

of weight or BMI that equates with a 'severe' or a 'not severe' impairment . . . . Rather, [the

ALJ] will do an individualized assessment of the impact of obesity on an individual's

functioning when deciding whether the impairment is severe."  SSR 02-1p, 2002 WL 34686281,

at *4.  Although all the evidence in the record must be considered, "the final responsibility for

deciding [an RFC] is reserved to the Commissioner."  20 C.F.R. § 404.1527(d)(2).

When an ALJ "idenif[ies] obesity as a medically determinable impairment . . . [the ALJ]

will consider any functional limitations resulting from the obesity in the RFC assessment, in

addition to any limitations resulting from any other physical or mental impairments."  SSR 02-

1p, 2002 WL 34686281, at *7.  The ALJ determined that Burke has the following severe

impairments:  lumbar degenerative disc disease with radiculopathy and cervical disc disease.

(D.I. 13-2 at 37)  Here, Burke argues that the ALJ misattributed her symptoms to obesity when

determining her RFC.  (D.I. 16 at 4)  The ALJ concluded that "obesity [was] not a severe

impairment" and noted that he considered Burke's functional limitations resulting from obesity

in making the RFC assessment.  (D.I. 13-2 at 38 (citing SSR 02-1p, 2002 WL 34686281)).

However, the ALJ also determined that no evidence in the record existed to suggest that Burke's

obesity had an impact on her pulmonary, musculoskeletal, endocrine, or cardiac functioning.

(*Id.*)  Moreover, the ALJ concluded that Burke's obesity is no more than a slight abnormality that

would have no more than a minimal effect on her ability to perform work activities.  (*Id.*)  The

ALJ considered Burke's obesity, including its effect on her ability to ambulate and on her other

body systems, when he determined her RFC.  *See* SSR 02-1p, 2002 WL 34686281, at *4 ("[The ALJ] will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."); *see also* 20 C.F.R. § 404.1545(a)(1) ("[The ALJ] will assess [a claimant's] residual functional capacity based on all the relevant evidence in [the] case record."); *Gregory*, 2019 WL 643736, at *9 ("In making [an RFC] finding, the ALJ must consider all of the claimant's impairments, including those that are not severe.").  The ALJ noted that the evidence did not suggest that her obesity was "more than a slight abnormality" or that it had "more than a minimal effect on [Burke's] ability to perform basic work activities."  (D.I. 13-2 at 38)  In addition, in making the RFC finding here, the ALJ considered "the entire record," not only evidence in the record related to obesity.  (*Id.* at 39–43) Accordingly, substantial evidence supports the ALJ's decision.

## V.    CONCLUSION

For the foregoing reasons, the court recommends denying Burke's motion for summary judgment (D.I. 16), and granting the Commissioner's cross-motion for summary judgment (D.I. 18).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objection and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order In Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated:  February 22, 2021

_____
Sherry R. Fallon
United States Magistrate Judge